James D. HODGSON, Secretary of Labor, United States Department of Labor, Substituted as Plaintiff for George P. Shultz (Resigned), Plaintiff,

v.

INDUSTRIAL BANK OF SAVANNAH and A. B. Gammon, Defendants.

Civ. A. No. 2666.

United States District Court,
S. D. Georgia,
Savannah Division.

July 26, 1972.

Judgment Aug. 22, 1972.

Beverley R. Worrell, Regional Sol., Anthony B. Cuviello, Atty., U. S. Dept. of Labor, Atlanta, Ga., for plaintiff.

Emanuel Lewis, Lewis & Javetz, Robert M. Williams, Bouhan, Williams & Levy, Savannah, Ga., for defendants.

## ORDER

LAWRENCE, Chief Judge.

This action was brought by the Secretary of Labor under The Fair Labor Standards Act (29 U.S.C.A. § 201 et seq.) and the amendment thereto represented by the Equal Pay Act of 1963. See 29 U.S.C.A. § 206(d)(1). The latter section prohibits discrimination between employees on the basis of sex by reason of paying wages to employees at a rate less than to employees of the opposite sex for equal work on jobs which require equal skill, effort and responsibility. Asserting that the defendants wilfully violated the law in the case of female tellers and bookkeepers, plaintiff seeks injunctive relief, including the restraint from the withholding of payment of minimum wages found to be due.

Section 206(d) makes an exception in the case of (a) seniority, (b) merit systems, (c) earnings measured by productivity in quantity or quality, and (d) cases of "a differential based on any other factor other than sex." The defendants rely on the last exception as justification for the lower wage paid by it to women tellers and bookkeepers than the rate paid to a male employee, performing the same functions, while allegedly training for a management position.

The case was tried before the Court without a jury on March 2, 1972, at which extensive evidence was presented.

The Industrial Bank of Savannah is a small financial institution employing at the time in question fourteen employees. It had three executives. One of them, A. B. Gammon, executive vice-president and cashier, is also named as defendant. On October 9, 1969, Marion B. Williams applied to the Bank for employment. He was then twenty-five years old. His experience consisted of newspaper apprentice work; sales trainee in a business machine concern, and clerking at Georgia Ports Authority. He was a high school graduate and had had some college courses while in the military service. Williams was hired by the Bank a few days after he applied for employment. The interviewer noted on the application that he "Looks like good prospect." The starting salary of Mr. Williams was $400.00 per month.

The Bank's records show that he was hired as a "Management Trainee" and Mr. Williams testified to the same effect. For the first three weeks he trained in the bookkeeping department, working alongside Miss Peggi Sue Butler whose wages were $280.00 per month. She testified that he was under her supervision; that she taught him her job, "everything I did," and that he performed the same duties as she. Mr. Williams thereafter trained under Mrs. Lynda Guyer, head teller, for about two months. She was earning $320.00 per month. Mrs. Guyer testified that he "did no more than I did." He watched what she did and subsequently took over an adjoining cage where he performed as teller under her general supervision. None of this was denied by Mr. Williams.

During the period of Williams' employment the salaries of women tellers and bookkeepers ranged from $280.00 to $295.00. The female head bookkeeper received a salary of $325.00 on January 1, 1969, which was increased to $350.00 before January 1, 1970.

Williams' employment terminated in January, 1970, about three and one-half months after he was hired. His employment record (Plaintiff's Exhibit #3) states that the reason for termination was "Unable to learn work." He had completed none of the courses in bank operations which are sponsored by the American Institute of Banking.[1]

The only other Bank employee with a management trainee qualification was hired as a "clerk" because it was thought that he had "potential." At the time this case was tried he was still in training and was in "loans." He started out in August, 1970, as a teller at $300.-00 per month. A month later his salary was raised to $325.00. At the time he was hired he had had no previous banking and little business experience. During the next two years he completed four of the ABI courses. When he was promoted to "management trainee" he had completed only the basic course. No woman employee or applicant ever participated in the defendant's "management training program."

The defendant Bank had no seniority or merit promotion and no formal internal training program and there was no formal management training program.

During the investigation the Compliance Officer of the Department of Labor was informed that the differential in wages was justified because the "women were more experienced and Williams had to put forth more effort to do the job." The Bank also contended that males are more likely to become a permanent employee as they do not leave to go to school or become pregnant. It argues that as a "Management Trainee" Mr. Williams was employed in a "bona fide training program" recognized by the Interpretative Bulletin of the United

1. The Bank automatically enrolls every employee at its expense to take these courses. Eleven of twenty-nine employees, whose employment records are in evidence, completed the first course, "Principles of Bank Operations." All of the eleven were females.

States Department of Labor.[2] Section 800.148 provides:

"Employees employed under a bona fide training program may, in the furtherance of their training, be assigned from time to time to various types of work in the establishment. At such times, the employee in training status may be performing equal work with nontrainees of the opposite sex whose wages or wage rates may be unequal to those of the trainee. Under these circumstances, provided the rate paid to the employee in training status is paid, regardless of sex, under the training program, the differential can be shown to be attributable to a factor other than sex and no violation of the equal pay standard will result." 29 C.F.R. 800.148.

The trouble with the Bank's position is the phalanx of authority which militates against its defense. The latest decision in the array appears to be Hodgson v. Security National Bank of Sioux City, (8 Cir., 1972) 460 F.2d 57. The complaint in that case charged the Bank with paying female paying-and-receiving tellers less than males doing equivalent work. Defendant sought to distinguish between the sexes by calling the former "management trainees." The Bank argued that the males (who were rotated among the teller witnesses) qualified as "officer material" under the management training program and that only men entered into it because women were characteristically uninterested in management positions. The District Court upheld this contention. The Ninth Circuit reversed. It ruled that the program does not fall within an exception to the equal pay provisions of the Act of 1963. The Court of Appeals pointed out that no woman ever qualified as a management trainee although several possessed college backgrounds and extensive working experience. It noted that under the Interpretative Bulletin (Section 800.148) training programs which appear to be available to employees of only one sex must be carefully examined as to bona fides and rejected where, traditionally, only employees of one sex have been considered eligible for promotion to executive positions.

In support the Court cited Shultz v. First Victoria National Bank, 420 F.2d 648 (5 Cir.). The Fifth Circuit reversed the district court in a case involving the defense that a training program justified higher wages being paid to male "management trainees." The program was supposed to provide rotation for the "trainee" through the various departments of the bank so the employee would more fully comprehend its operations. The Court found that rotation was not distinguishable from the normal course of employment for the female employees and concluded that the training program relied on for unequal pay lacked "any other factor than sex" since "the work performed and the employment roles of the male and female employees were the same."[3] It was further held that the Bank's training programs, which were described as "vague, almost illusory," had been applied discriminatorily.

<hr>

2. The comprehensive Regulations promulgated by the Secretary of Labor are generally valid and binding and are a helpful and reasonable aid to a correct interpretation of the law. Wirtz v. Basic Incorporated, D.C., 256 F.Supp. 786, 790. Interpretative bulletins of a governmental department should be given weight and serve as guidance to the federal courts. Hodgson v. Security National Bank of Sioux City, (8 Cir., 1972) 460 F.2d 57.

3. On remand the district court again dismissed the case but for different reasons than the "management training program" exception to the equal pay requirements which was previously relied on and dealt with by the Fifth Circuit. The lower court found that the wage differentials were due to inequality in work assignments and to the merit system used in promotions of employees. See 63 CCH Lab.Cas. § 32,378 (S.D.Tex.1970). In a per curiam decision the Fifth Circuit affirmed, Hodgson v. First Victoria National Bank, 446 F.2d 47, holding that there was substantial evidence to support this finding.

Hodgson v. Fairmont Supply Company (decided January 20, 1972, but officially unreported), 67 L.C. § 32.613 involved a wholesale supplier and clerks whose duties consisted of keeping inventory cards. A male employee who worked next to them performed the same task and had been hired as a "sales trainee." As such, he went through some of the phases of sales processing. He worked on the stock desk for three and a half years before being replaced by a woman employee. Her starting salary was $165.00 per month less than his. The Court of Appeals for the Fourth Circuit reversed the lower court which had justified the disparate treatment in wages on the "trainee" theory. It found that even if there were a training program for salesmen, the male employee was not a trainee and that his work at the stock desk was permanent rather than a temporary station by which one might work himself up in the company.

A number of other cases support the views expressed in these decisions, for example, Hodgson v. Miller Brewing Company, 457 F.2d 221 (7 Cir.); Hodgson v. Robert Hall Clothes, Inc., D.C., 326 F.Supp. 1264; Hodgson v. City Stores, Inc., D.C., 332 F.Supp. 942. See also 7 A.L.R. Fed. 707–755. I know of no decision that gives countenance or comfort to the Bank and its contentions.

■■■ Applying the Equal Pay Act as it is judicially and administratively construed, the undisputed facts lead but to the conclusion that the wages paid to defendants' employees differed for equivalent work as between members of the opposite sex; that same was based on no other factor than sex, and that no bona fide training program existed within the meaning of the exception in § 206(d)(1) and Section 800.148 of the 1971 Interpretative Bulletin; 29 C.F.R. 800.148. The burden of proving such affirmative defense is upon the employer. Hodgson v. Robert Hall Clothes, Inc., *supra*, 326 F.Supp. 1275; Wirtz v. Basic Incorporated, *supra*, 246 F.Supp. 786.

■■ So finding and holding, what relief is required? The equal pay provisions are an integral part of the Fair Labor Standards Act and a violation thereof by any person is unlawful. An employer who does so is liable to the employees discriminated against. District courts may enjoin violations as well as restrain the withholding of amounts due employees under the Act. 29 U.S.C.A. §§ 216(b) and 217. The equal pay provisions have the status of unpaid minimum wages under the Fair Labor Standards Act and require payment of additional wages to meet the equal pay standard. 29 C.F.R. 800.166(a), (d).

■ Whether an injunction should be granted for future violations is within the general equitable jurisdiction and powers of the court. However, judicial discretion must be exercised "with an eye to the purposes of the Act." See Wirtz v. B. B. Saxon Company, 365 F.2d 457 (5 Cir.); Shultz v. Parke, 413 F.2d 1364, 1368 (5 Cir.). Mitchell v. Pidcock, 299 F.2d 281 (5 Cir.); Mitchell v. Hodges Contracting Co., 238 F.2d 380 (5 Cir.).

At the trial the defendant urged that since the Industrial Bank of Savannah would shortly be merged with the First Bank of Savannah and would then go out of existence an injunction against future violations should not be granted. There was testimony that the officers of the defendant Bank would become officers of First Bank of Savannah which is the surviving corporation. While it is not in the record, the merger has been effected since the trial.

■ Plaintiff says that a discontinuation of illegal labor practices by a defendant, either by going out of business or otherwise, after institution of legal proceedings against it by a public agency, does not render the controversy moot. Walling v. Haile Gold Mines, 136 F.2d 102, 105 (4th Cir.). However, there must be a reasonable expectation that the wrong alleged will be repeated. United States v. Logan Co., D.C., 147 F. Supp. 330, 336. Where an erring em-

ployer closes his plant, there is no need of an injunction in a wage and hour case in the absence of evidence of prospective future violation. Walling v. Livernois, D.C., 50 F.Supp. 978, 980. See also Mitchell v. Chambers Const. Co., 214 F. 2d 515, 517–518 (10 Cir.). There is no such evidence before the Court and the facts do not permit a deduction in that respect. I see no need of restraint of future violations by a Bank which has been merged into a larger one as here.

However, I do not foreclose plaintiff altogether in that respect in the light of the fact that no evidence has been adduced on the subject of the consummation and results of the merger. If the parties desire to present evidence in this respect they will be given opportunity to do so.

The grant of a restraining injunction as to withholding any amounts found to be due to employees who have been subjected to equal pay discrimination is a different matter. Such equitable relief follows a finding of liability.

Plaintiff contends that the fact that Mr. Williams' employment was terminated does not relieve the Bank of the obligation to pay female bookkeepers and tellers the same salary ($400.00 per month) he was paid during the entire period from October 13, 1969, when he was hired, until the present time. As of March 2, 1972, this amounted to $20,081.90 in the case of twenty-five women employees performing similar work as tellers and bookkeepers.[4] This computation was made by adjusting the weekly earnings of the female employees to the $92.31 per week which Mr. Williams was earning during his brief stay with the Bank.

The Secretary argues that the fact that his employment terminated in January, 1970, does not relieve defendant of the obligation to pay women bookkeepers and tellers while Williams was employed and thereafter up to now at the rate of $400.00 per month. He cites the Interpretative Bulletin provision which states that "it would be contrary to the equal pay requirement to pay the female employee a lower wage rate than was paid for the same job when performed by the male employee . . . if all employees of one sex are removed from a particular job (by transfer or discharge) so as to retain employees of only one sex in a job previously performed . . . by employees of both sexes." See 29 C.F.R. 800–114. The statute itself prohibits an employer in violation of the equal pay provision from using a reduction of the wage rate of any employee as a means of equalization. 29 U.S.C.A. § 206(d). See the House Report in 109 Congressional Record 9196, 9210 (1963).

In a case of wage discrimination between sexes the last rate which an employer pays to each male employee is thereby established as the minimum rate which the defendant is legally obligated to pay women performing substantially the same job under similar working conditions. Wirtz v. Meade Mfg., Inc., D.C., 285 F.Supp. 812. A violation of the Act "will continue until the company, by new contractual arrangement by voluntary action or by court order, raises, or is forced to raise, the wages of the female operators to that of the male operators as of the time the males ceased to operate the machines together with all increments to date." Shultz v. Saxonburg Ceramics, Inc., D. C., 314 F.Supp. 1139, 1146; 7 A.L.R. Fed. 751–752. See also Hodgson v. Daisy Manufacturing Company, D.C., 317 F.Supp. 538, 552.

It is nonetheless difficult to conceive that Congress could have intended so harsh and inequitable a result from an isolated, non-wilful and non-intentional violation.[5] At the time it occurred the

---

4. The computations appear on a "Comparative Rate Schedule" which were taken from employment records introduced in evidence and presented to the Court by plaintiff following the trial.

5. I will add that a review of the legislative history of the bill—the hearings, the committee reports and the debate—is unproductive in revealing any congressional intent in this respect. See 109 Congres-

provision of the Administrative Bulletin as to training programs (29 C.F.R. 800.-148) was in existence. However, in 1969 the case law as to trainee exceptions, as illustrated by the decisions cited, had not been developed. It strikes me as a rather drastic and mechanical consequence of a violation such as this to warrant the imposition of a wage basis of $400.00 per month for all female tellers and bookkeepers from the time Mr. Collins was employed and thenceforth.[6] Suppose his experience, education and potentiality as managerial material had been such that he had been hired at a salary of $600.00 per month. Would any such unrealistic method of calculating an employer's liability be equitable? The Interpretative Bulletin provides, as noted, that an employer cannot circumvent or avoid his liability by the transfer or discharge of an employee so as to leave those of one sex performing the type of work involved. See 29 C.F.R. 800.114. But here the termination of employment did not represent any effort on the Bank's part to bring itself into compliance or avoid the consequences of the violation of the Act.

Defendant has not had sufficient opportunity to reply to the Secretary's contentions in this respect. Counsel for plaintiff have stated their legal position and the basis for it but have not addressed themselves fully to the problem. I think the matter calls for further exploration and consideration. I shall not make any ruling at this time as to the amounts due the female employees involved. I reserve such decision until after further argument.

This Order satisfies Rule 52(a) as to findings of fact and conclusions of law in respect to the violation. We are left with the following unfinished business: (a) development of the existing record in regard to the merger and its impact as related to injunctive relief against future violations; (b) the amount of wages due each female employee with especial reference to the proper period for calculation thereof, and (c) the question of interest.

Under the circumstances, I will put this matter down for oral argument on the legal issues referred to on August 22nd next. At that time evidence will be received, if counsel desire, relative to the injunctive relief feature. I would like to have in advance of the hearing any memorandum of law that counsel may care to present.

## JUDGMENT

This cause came on for trial before this Court sitting without a jury on the 2nd day of March, 1972. The Court having considered the pleadings, the evidence and the briefs of counsel, entered a Order containing its findings of fact and conclusions of law on July 26, 1972. Subsequently, the parties entered into a Stipulation which was filed herein on August 22, 1972. Now, therefore, in accordance with said findings and conclusions and the stipulation of the parties it is

Ordered, adjudged and decreed that the defendants be, and they hereby are, restrained from withholding payment of minimum wages found by the Court to be due defendants' employees, as a result of the defendants' wage discriminations on the basis of sex, for the specific periods of employment and in the amounts as set forth in Schedule "A" appended hereto and made a part hereof.

To comply with this provision of this Judgment, defendants, within fifteen (15) days following entry of this Judgment, shall deliver to plaintiff's attorneys a cashier's or certified check payable to "Wage and Hour Division—La-

---

sional Record (1963); U. S. Code Congressional and Administrative News (1963), 687–692.

6. I am aware that "the banking industry, which is noted for low wages," was given particular attention by the House subcommittee in connection with female tellers. See Shultz v. First Victoria National Bank, *supra*, 420 F.2d 648, at 658 n. 21.

bor" in the total amount stated in Schedule "A" hereto, *less* deductions required by law as to each employee.

The defendant shall also provide plaintiff's attorneys with a schedule showing its employer identification number and the last-known address, social security number, gross amount, deductions and net amount as to each of the employees listed on Schedule "A" hereto.

Plaintiff shall distribute the proceeds of such check to the persons named, or to their personal representatives in the amounts indicated, less deductions required by law, and any money not so distributed by the plaintiff within the period of one (1) year after payment pursuant to this Judgment because of inability to locate the proper persons or because of such persons' refusal to accept such sums, shall be deposited with the Clerk of this court who forthwith shall deposit all such money with the Treasurer of the United States pursuant to 28 U.S.C. § 2041 (1964).

Further ordered that so much of the Secretary's complaint as seeks an injunction against future violations of the "Equal Pay" provisions of § 6(d)(1) of the Act be and the same hereby is dismissed.

Costs of this action shall be taxed to the defendants for which execution may issue.

APPENDIX

SCHEDULE A

| Employee | Period From | To | Back Wages | 6% Int. | TOTAL |
|---|---|---|---|---|---|
| Mary H. Akins | 9/15/70 | 2/25/71 | 89.44 | 5.37 | 94.81 |
| Sevenia J. Andrews | 1/13/70 | 2/26/71 | 1,205.93 | 72.36 | 1,278.29 |
| Margie L. Balcom | 10/13/69 | 5/8/70 | 524.95 | 31.50 | 556.45 |
| Marchelle T. Beasley | 1/11/71 | 2/18/71 | 31.74 | 1.90 | 33.64 |
| Pegi S. Butler | 10/13/69 | 3/15/70 | 609.18 | 36.55 | 645.73 |
| Linda A. Carroll | 10/13/69 | 1/30/70 | 387.69 | 23.26 | 410.95 |
| Barbara A. Davis | 10/13/69 | 6/30/71 | 957.82 | 57.47 | 1,015.29 |
| Lynda A. Guyer | 10/13/69 | 9/11/70 | 678.36 | 40.70 | 719.06 |
| Judy W. Jacobs | 10/13/69 | 4/1/70 | 605.75 | 36.35 | 642.10 |
| Clara B. Plummer | 1/26/70 | 7/17/70 | 595.41 | 35.72 | 631.13 |
| Georganne Thompson | 9/15/70 | 9/15/71 | 242.34 | 14.54 | 256.88 |
| Sue H. Wilson | 1/15/70 | 2/6/71 | 1,204.71 | 72.28 | 1,276.99 |
| Vickie L. Zettler | 9/15/70 | 2/18/72 | 319.72 | 19.18 | 338.90 |
| TOTALS | | | $7,453.04 | $447.18 | $7,900.22 |